Good morning, your honors. My name is Ben Coleman. I represent Mr. Yepiz, and with the, I believe it's Yepiz, and with the court's permission, I was going to start off briefly with the voir dire issue and then move to the evidentiary issues. I'll watch the clock and attempt to save three minutes for rebuttal. On the voir dire issue, it's our position that there was a plain error in this case, and I think that there's not much dispute there. The real question is whether under this court's recent decision in Lindsay, reversal is required or the appropriate remedy for that plain error. I'm just curious, is this a normal procedure in that district court to use the process that was used in this case for peremptories, that if a party accepts, the jury is constituted, that constitutes a waiver of the peremptory challenges? Is that the usual practice in this court? Do you know? The government in their response brief says that it is a common practice. I do most of my trials in the Southern District of California as opposed to the Central District, but I am aware from talking with other lawyers in the Central District that this particular judge repeatedly uses the use it or lose it policy. This wasn't a one-time situation. That was unusual to me. When I was a district court judge, I never used that practice, so I was just curious as to whether that was something that was used. Correct. And in the Southern District of California, we never used that, or at least none of the judges that I've appeared and tried cases in front of used that practice either. So this appears to be, I guess, a repeated practice in the Central District of California. I'd also note that in the Lindsay case, the judge offered the parties the choice as to how they wanted to do it, and the parties elected to do the use it or lose it policy. So it's something that, this isn't a one-time situation. But I'm not sure that there's anything inherently impermissible about the use of that policy. It's different, but I'm not sure there's anything inherently wrong with it. Well, it's our position that under this Court's long-standing precedent, it is error. There's a case called United States v. Turner that was decided in 1978, and it was followed again in a case called Landis and in a case called Medrano in the 1980s and 90s. So for three or four decades now, this Court has held that the use it or lose it policy is erroneous. So you think Turner specifically addresses the use it or lose it policy? Yes, I do. Okay. And in Medrano and Landis, both did as well. So it's our position that the error here was plain under long-standing precedent, and the question is whether reversal is appropriate or required. Admittedly, in the Lindsay case, this Court took a different... You know, plain error is an odd concept. Both it's an ordinary term, but it's also a term of art. In order to establish plain error under the doctrine, it not only has to be obvious, which is the normal meaning of plain error, but under our plain error doctrine, it also has to result in, I forget the precise formulation, in some fairly strong miscarriage of justice. Those aren't the words, but there's that third line, and I forget what the formulation is, but that's what it means. So you've got to show not only that it was an obvious error, but that it caused a genuine and deep problem. That's correct. The first two prongs are four prongs. The first two are just, is there error and is it plain? I think we've satisfied those clearly. But the next two prongs are the third prong, which is what Your Honor was mentioning. Was a substantial right affected? And then the fourth prong is, would the fairness and integrity of the proceedings be implicated? And I'm kind of putting those two together, right? Is this a really serious problem? Correct. And I'll kind of lump those two prongs together as well. And it's our position that if, in order to satisfy the third and fourth prongs, an appellant has to demonstrate that a juror was actually biased. That would essentially write out the right to a parenteral challenge, because if a juror is actually biased, he would have a freestanding Sixth Amendment claim. Would write out the right to a parenteral challenge maybe in circumstances where there was no objection? I mean, had there been an objection at the time, we'd have a different case. Well, I guess the – let's assume for a moment there was an objection, hypothetically. I mean, under the government's position, their position is that the only way that an error can be harmful in this instance is if the juror was actually biased. Other than that, even if there was an objection, you wouldn't get reversal. And it's our position that there's no way that you can ever tell whether – what went on in the jury room. And that's what this Court has said in an embanked decision in Anagoni, which Lindsay overruled. And our position is that to decide the third and fourth prongs, the Court should just simply look at – let's take a look at the evidence. If the evidence was overwhelming, then we can comfortably say that there was no harm here, which is what a court normally does when looking at the third and fourth prongs of the plain error test, or even the normal harmless error standard. If a court says the evidence was overwhelming, this error didn't affect anything. Why don't we look at the juror that was in play and see whether or not there was any indication that that juror would not have served as an unbiased juror? Well, I think that if the court is going to look at the juror individually and look at the juror, at the most the defendant should have to show that it's the type of juror that you would want to use a strike on. If you have to show actual bias again, then I think you're running right back into this as a pure Sixth Amendment claim. You wouldn't need to do the parenteral challenge claim because if a juror is actually biased, then you would have a freestanding Sixth Amendment claim. Well, no, if there's a likelihood that this would have been a juror that would have been challenged, maybe you've made your showing, but if there's nothing about the juror that would indicate that there was a problem with the juror from the defense perspective, I don't see how there can be any prejudice shown. Well, I'm willing to take that burden, which is to show is there something about the juror that would have caused the defense to use the strike. And we believe in this case there was. The juror was an intern, had a law degree, and had interned with the Santa Barbara District Attorney's Office. And if I was the trial counsel and I had a peremptory, that was a juror that I probably would use a peremptory on. She had also worked in her husband's criminal defense practice as well. She did. The husband had generally, I think, an estate planning practice, but had handled a few misdemeanor DUIs, I believe, and a couple of other low-level cases she had indicated. But she had interned in the prosecutor's office, was involved in cases that involved gangs, which this case was a gang case. No, she was not involved in cases involved. She was involved in cases involving juveniles, but no cases involving gangs. I believe what she said was she, in the juvenile department that she worked in, that there were gang-related issues that came up in those, but that that wouldn't affect her ability to judge a case. But she was not her, she specifically was asked whether she was personally involved in cases involving gang members, and she said no. I'll take a look. ER-164, you can check it. Okay, I'll take, I'll look at it again. My recollection was that she said there were the juvenile proceedings, that she was involved, that there were issues involving gangs, but that it wouldn't affect her ability to decide the case. But I will stand corrected if I'm wrong, and I'll look at that when I sit down. Well, counsel, if the district court plainly erred in admitting Mrs. Cruz's testimony, wouldn't it be harmless error? On that issue, Your Honor, we believe it would not be harmless error. And the reason why is that the only evidence that the government had against Mr. Yepes, as far as killing the victim, Eugenio Cruz, was testimony coming from cooperating witnesses. They didn't have any physical evidence linking him to the murder at all. All they had were the word of this one specific cooperating witness, and then another cooperating witness or two who supposedly corroborated him. The only, Mrs. Cruz was the only witness who could provide any type of information that was not basically, you know, working for the government or, you know, how to deal with the government where they would get sentencing benefits. So it's our position that the evidence in the case as to the murder itself was not overwhelming, and therefore, we believe it was erroneous to admit that statement to the mother of the victim. And it was obviously a very sympathetic situation when that witness got up and took the stand as the mother of the victim and was the very last witness in the case. That was a very ñ it had a lot of impact for the jury. Well, I know your position is that the evidence wasn't overwhelming, but it was certainly a tremendous amount of evidence, wasn't there? Well, there was a tremendous ñ I would agree that there was significant evidence that Mr. Yepes was involved with this gang. There was a lot of evidence of that. He had the gang name tattooed on his body. I mean, there was ñ there really wasn't any dispute about that. But as to the actual murder of this particular victim, there was no DNA, no fingerprints, none of the normal things that you would see in a murder case. All that ñ the only evidence that the government really had was they had this star cooperating witness who said, I was there, I was in the car, and Mr. Yepes pulled out a gun and out of nowhere shot the victim in the back of the head. And then they brought in another cooperating witness who said, yeah, this guy who was in the car, he told me that that's what happened. I mean, that was their evidence as to the murder. It's our position that, I mean, typically, that's the type of case that jurors ñ and you look at these witnesses, I mean, it's not just the fact that they're cooperating with the government. They had long histories of criminal involvement, felony convictions, inconsistent statements. I mean, these witnesses are by no ñ by no stretch credible witnesses. I mean, they have a lot of baggage with them. And when they brought in this one witness who didn't have any baggage, it really corroborated the case for them and was a sympathetic witness as well. And it was the very last witness in the case as well, which was sort of a strategy, I think, that the government successfully utilized. The other evidentiary issue that I'd like to discuss in the remaining minute or two is the issue about excluding the expert ñ proposed expert testimony. In this case, Mr. Yepesís alternative defense was that even if the jury were to find that he was the one responsible for the murder, he didn't do it for the purpose of enhancing his status in the gang, which is what is required for a Vicar conviction. And there was lay testimony that documented Mr. Yepesís mental illnesses. He was acting in the months and years, frankly, preceding the murder in a very bizarre manner. And, in fact, the proceedings in this case were delayed by many years because of his mental illness until he was rendered competent to stand trial. And the defense wanted to present an expert witness to testify about Mr. Yepesís schizophrenia and other mental health problems. And we believe that that testimony would have been relevant to show that the murderer, if he was the responsible party, was not to enhance his gang status, but was just as a result of his hallucinations and otherwise schizophrenic behavior. We believe that the case law indicates, under cases like Cohen, which is a fairly recent Ninth Circuit case, that that type of testimony is relevant. The argument that it should have been excluded under 403 because it would confuse the jury, frankly, this is, I think, fairly understandable testimony. An expert would get on the stand and testify that he, Mr. Yepes, has been diagnosed with schizophrenia, and then the defense attorney can argue that point to the jury. I donít think that is anything that is confusing or very unusual in a criminal case. I donít see how that possibly could have confused the jury and would be subject to a 403 exclusion. So itís our position for those three errors, and we also have an additional fourth error or a combination error of that reversal is required. And if there are no other questions, Iíd save the remaining time. Why donít we hear from the government, and then youíll get a chance to respond. May it please the Court, Neeli Moradam on behalf of the United States. Your Honor, let me start first by addressing the voir dire issue raised by my adversary. It is the governmentís position thatís set forth in our papers that Lindsay absolutely forecloses that claim. And that is because, Lindsay holds, that a defendant must show that his substantial rights were affected. He must make that claim. But that doesnít mean that there was no error, right? It is our position that there was no error, Your Honor, and thatís in light of Turner and how itís been interpreted over the 32 years since itís been issued. And thatís because this Court in Pimentel held that Turner was limited, that the holding was restricted to the fact that a defendant should not be unduly restricted in the exercise of his peremptory rights. And it found that the remaining language about the use-it-or-lose-it policy was simply dicta. But even if this Court finds that it was, in fact, error, the plain fact is that this defendant did not object to it. And this Courtís recent precedent in Lindsay holds that the defendant must show prejudice. The sole claim of prejudice raised in his opening brief is that a juror served as an intern for six months or so, over 11 years ago, in the DAís office. That is, despite having served for 11 years in her husbandís practice, that included criminal defense work. In reply, defendant raises a different claim of prejudice, and that is one about the jury as a whole. But he doesnít go beyond that to explain how this jury was in any way biased or why there was some other prejudice. You know, I think I understand how this happened, but could you review to me precisely how we ended up with the defense not having a peremptory challenge, this person comes up and somehow the peremptory challenges are all used up? I didnít quite understand how that happened. Yes, Your Honor. First, the district court explained to the parties before trial began that it would be using this, quote, ìuse-it-or-lose-it policy.î He then explained that policy in detail, asked both parties if they had any questions. No one had a question. No one, including the defendant, objected to that policy. Okay. Now tell me how it worked. Now it worked as follows, Your Honor. The government began and exercised two peremptories. So tell us how many peremptories each side had. Each side had the statutory allotted amount, which escapes me at the moment. I believe the defendant was entitled to ten. I donít remember right now how many the government got. I think six, but it doesnít matter. Six. We exercised them. The defendant exercised eight of his peremptories.  But it was in the middle. Itís not like he weighed them. It wasnít in the middle. It was, Your Honor. So the judgeís practice was if a defense attorney accepts the jury as constituted at that particular snapshot in time, that constitutes a waiver of that peremptory challenge. So if the defense has exercised six peremptory challenges, then accepts the jury, that counts as the seventh peremptory challenge. Then if the government exercised a peremptory challenge and the defense comes back and does it, thatís his eighth peremptory challenge. Thatís how it works, right? Correct, Your Honor. And in this case, the ñ after the government exercised its third peremptory challenge, the defendant exercised his fifth. Then a replacement juror was seated and defendant for the first time accepted the panel as constituted. This is on page eight of the governmentís response brief. The government then exercised its fourth peremptory challenge and a replacement juror was seated. Defendant then exercised his seventh. And then rather than exercise his eighth peremptory challenge, the defendant accepted the panel as constituted. And thatís how we ended up with him having ñ He accepts it as constituted. Then the government exercises another peremptory challenge. Thatís correct, Your Honor. And then we get this person and heís, quote, ìused them all up even though heís actually challenged fewer than ten people.î Your Honor, he ñ I actually believe I misspoke. The government then exercised its fifth. Defendant exercised his ninth. And then before he ñ He exercised his ninth by saying, ìThe juror of the panel is okay with me.î No, he actually exercised his ninth. He did actually exercise his ninth, Your Honor. And then he actually exercised his tenth by ñ A fictional tenth as opposed to the actual tenth, right? I mean, weíre just trying to understand. Exactly. Heís eighth. So he exercises eight peremptory challenges by actually challenging the witness. Thatís correct, Your Honor. Or rather, the juror. But two of them he exercises by just saying, ìThe jury as it is now constituted is fine with me.î And he said that twice. Thatís correct, Your Honor. So those count as peremptories. Yes, Your Honor. And then when this last juror shows up, heís exercised two of his peremptories by saying, ìThe jury as presently constituted is fine with me.î How can that possibly not be error? Your Honor, itís not error because this is a policy that the district court laid out. Well, just because a district judge has a policy doesnít mean that thatís right. Understood, Your Honor. But district courts, itís this circuitís precedent that they have wide discretion in determining the manner in whichÖ Yeah, but he just took away actually two peremptory challenges. I mean, in terms of each time he says, ìThe jury is fine with me.î Thatís an accurate statement because the jurors that are up there are fine with him. Then it shows up another juror that may or may not be fine with him, and heís only said, ìTheyíre fine with me.î as with respect to the jurors that are in front of him. And heís exercised eight actual peremptory challenges. He has ten. This strikes me as just, to use the term plain, I hear mean obvious. That strikes me as just obvious error. Your Honor, if I could just explain perhaps in context, this would have been no different than if after he passed for the first time, letís say, the government had said, ìWe also pass.î Thatís different. Thatís different because then both parties are satisfied with the jury. You know, when I was a district court, I think most district court judges acknowledge that if both parties are satisfied with the jury, there is no reason to exercise any additional peremptory challenges. But if one side is satisfied and then the other side changes the composition of the jury, thatís not the same thing. Your Honor, then Iíll add this. It certainly is no different than if the defendant had exercised and exhausted all of his ten peremptory challenges and the government had challenges remaining. A replacement juror like the juror hereó No, you donít get the point. In your hypothetical, youíre just going, ìHeís actually had ten people that heís objected to, and he has peremptories as to ten.î But in this case, he has had only eight people to whom he has actually objected to. Your Honor, certainly, again, for the reasons set forth in our brief, we donít believe itís error. We certainly donít believe itís obvious error, and Iím just arguing from the meaning of ìobvious.î Well, to me itís obvious. It may not be to you. And I have not consulted with my colleagues. Understood, Your Honor. And in light of the Courtís comments, let me move to why Lindsay just forecloses this argument, and that is because no prejudice has been shown. As this Courtó Thatís another question, is whether itís plain error in the sense of how bad was this? How bad were the adverse consequences? And nothing has been shown by the defense as to whether or not this was prejudicial. In fact, everythingó But his point is, how can he show that? Because heís not in the jury room. We donít have testimony from the jurors. Weíre not allowed to get testimony from the jurors. The only thing we can look at is, okay, what was the evidence presented? How strong was it? What characteristics do we have of this juror? And, you know, they kind of go either way. I think most defense lawyers probably would have challenged her peremptorily. Some wouldnít have. It doesnít look as though thereís challenge for cause. So, I mean, what are we supposed to do? Weíre just supposed to say, ìOh, thatís okay to me because I canít tell.î First of all, Your Honor, in this case, there was no for-cause challenge to this juror. Thatís why. Well, there couldnít be. I mean, there wasnít for cause. I mean, there was no cause. Thatís why itís so important to have the peremptory challenges. Understood, Your Honor. But that goes to whether or not this juror was the type of person who this defendant believed would not be impartial. Right. She definitively told the district court she would be impartial. She would listen to the district court. A lot of them say that, and then a lot of them get challenged by peremptory. And, Your Honor, you know, the argument that you raise about whether or not a defendant who claims prejudice is foreclosed from actually showing it because theyíre not in the jury room was addressed by the Supreme Court in Rivera. And it rejected that argument that the improper seating of a juror is not amenable to harmless error analysis because itís improper to ascertain how a properly seated juror would handle that. Well, let me ask you this. Did the trial counsel submit any kind of affidavit saying that he had plans to exercise a peremptory challenge against this juror? If he had had the opportunity, he would have done so. Is there anything in the record to that effect? No, Your Honor. In fact, the time when he was about to exercise his last peremptory, he was advised, ìThis is your last peremptory.î He did not at any time question that that was, in fact, his last peremptory, that the district court had somehow miscalculated. He was not caught off surprise here. You know, the animating principle in Turner was the lack of notice. In that case, the defendant was essentially ambushed and left without any peremptories. Here, this was a policy of which everyone had an advance notice. No one objected to it. Everyone understood it. And the district court did precisely what it said it would do. Is this the only judge in the central district who does that? Itís common in the central district? It is, Your Honor. In my experience, itís common. It sounds like we need to write an opinion if my colleagues agree with me. Well, I was concerned that Your Honor would take that to that logical extension. It is, in my experience, Your Honor, a practice that is common. To my knowledge, itís Judge Walterís practice, but heís not the only one. But putting that aside, Your Honors were absolutely correct in focusing on the fact that here there was no objection. And given that this is something that is done commonlyó Itís really difficult to object. I mean, itís really hard for attorneys to object if a judge says, ìHereís how itís going to be.î I mean, itís really tough for attorneys to say, ìWe donít like that.î Because you have the judge whoís getting ready to preside over the trial. I mean, itís a tough predicament for an attorney to be in. It really is. But it is common practice throughout the district? It is common practice throughout the district, Your Honor. For all the district judges or most of them? No, not all of the district judges. Thatís not the representation Iím making, and Iím not certain I can say most. But there is a sizable number of district court judges in the central district that do employ this practice time and time again. Learned Counsel couldnít have objected. Iím the first to agree that itís hard to object, particularly through the government. But in this case, you know, this was a courtroom where everything was done in a considered manner, as evidenced by, for instance, the way the district court handled the mental health exam issue. Rather, the mental health testimony issue. Do you know why the judges in the central district elected to proceed in that manner regarding parenteral challenges? Your Honor, itís my understanding that the concern is that one party or the other will just shore up their parenteries, and then once the juryís settled, theyíll use all of them at the end. But thatís part of the game. And, you know, Iím not here to argue that. I will just, to answer Your Honorís previous question about whether or not at any point defense counsel said, wait, wait, I wanted to object, I didnít get a chance to. Thatís not at all what happened here. Or say that if I had had the opportunity, I would have exercised my peremptory against. Right. That is not even a claim being made on appeal. And, in fact, at the time, the district court, once he determined that everyone had exercised their peremptory challenges, said, you know, we have no additional peremptory challenges. This will be our jury. Is there any reason why the jury should not be sworn? Certainly at that point, the defendant could have objected. At any time when he was advised throughout this process, you have no more, or youíre about to lose your last peremptory, he didnít. No, no, I mean, weíre clearly in plain error territory because he didnít object. We got that. And Lindsey forecloses it because there is no prejudice. The defendantó Thatís such a valuable tool for the attorneys. Itís just really ñ I just really find it hard to understand why a district court judge wouldnít let the full panoply of peremptories just play out. I donít understand that. I understood, Your Honor, but let me again keep coming back to the fact that thereís simply no prejudice here. No claim that this juror, in fact, was biased, just a suggestion that is not borne out by the record. No claim that the jury as a whole was biased. Thereís nothing in the record to suggest that this juryó Weíre left with so few analytic tools to figure out how serious the error was or whether there was prejudice and so on. Whatís your response to the argument that weíve just heard that the evidence ñ not that he was a gang member. Thatís, I think, undisputed, really. But the evidence that, number one, he was the killer and, number two, that he did it for purposes of increasing his status in the gang. The argument on the other side is, you know, the evidence was kind of thin because, you know, youíve got all these self-interested people. You know, government witnesses in these circumstances, we know that theyíre not the most honest people. So whatís your response? First, Your Honor, we had Gustavo Rodriguez testify to what he unwittingly witnessed that night. We had Anthonyísó Yeah, but he might have lied, which was the point. Understood. And I just want to get through it. I know I have limited time, but we hadó Iím fine. Iím sorry. Okay, great. Thank you. We have Dana DeLaCuesta who testified and said that on that night of the murder, she saw a defendant there at the bar the moment she arrived with the victim, Cruz. The defendant walked up toó She wasnít a gang member or anything. No. She had noó No. This was somebody we had to subpoena to come in and testify. She said that when defendants saw her drive the victim up to the bar where they were all outside, the defendant walked up to the victim, put his gun to the templeóa fake gun, Iím sorry, a handgun, just so the record is clearóto the temple of the victim and did a motion like this, and Iím motioning for the record that he shot. Were you trial counsel? I was in fact trial counsel, Your Honor. I didnít know you were trial attorney. I was trial counsel along with a colleague of mine from the office. Then we have testimony from Anthony Asensio that he also saw the defendant there at the bar. We have testimony from a witness who lived on the street describing someone who looked like defendant running back to a car that matched the description of a car the defendant was driving that night. We also have, Your Honor, testimony from two individuals who saw defendant after the shooting who said that he came to this guy Balaís house. Bala testified, by the way. And the defendant had blood all over his white shirt, the same white shirt that Dana DeLaCosta described, by the way, which at that time did not have blood on it. And the defendant was cocking a gun and saying that he was now El Senor. We submit, Your Honors, that that was, you know, ample proof that this defendant was the killer. We also present an ample proof at trial, Your Honors, that this defendant did this killing in order to depose the shop caller of the gang. This was documented in a letter writing campaign to the Mexican mafia leader in charge of the gang. After he received the letter from Cruz, not the victim Cruz, but Cruz, the Mexican mafia leader at Pelican Bay, saying what he believed to be permission to kill the shop caller, he went around town showing this to everyone who was a key person in the gang, including his brothers, Rafael Yepes and Manuel Yepes. Once he did that, he was told by the representative to the Mexican mafia leader, ìYou do not have permission to kill.î This was at two separate meetings where he was told, ìDo not kill.î And yet two weeks later he killed Cruz. So there was ample evidence. And, Your Honor, just going back one more thing before my time runs out, as to how we know that this jury got it right or that this jury made a considered judgment. This is a jury that after about, I believe, seven days at trial, took a day and a half. But they were guided by an eight-page special verdict form that, while it's not in the excerpts, Your Honor, it's certainly in the record, that had 14 questions with multiple subparts in it. As to count three, for instance, the subparts were, did he commit narco-conspiracy? If you find that he did, let's talk about cocaine. If you find that he distributed cocaine, let's talk about the quantities. And this was a very guided process. And the jury, while they came back with guilty verdict on all five counts charged, they did not find that this defendant, for instance, manufactured cocaine use. This is a jury that was paying attention, looked at the evidence, and applied the law. And defendant has not shown anything in the record to suggest otherwise. And Rivera, in any event, has said that you cannot simply say that, you know, throw our hands up and say we can't show prejudice because we don't know what happened in the jury room. I would respectfully submit, Your Honor, that we know that this jury considered because they were guided by that special verdict form. Did they return an NG on one count? Not on the count, Your Honor, but as to an object of the conspiracy, which was manufacturing cocaine base, they found not guilty as to that object of the conspiracy. Thank you. Thank you, Your Honor. Mr. Coleman, response. Thank you. Judge Rawlinson, that ER-164 that we had discussed, I don't think it's entirely clear what the perspective juror says is we had a couple of cases where we had, you know, local gang members in trouble, but nothing that I was personally, and the Court interrupts, nothing that you had personal involvement with. She says, right, just in dealing with the caseload. So I'm not sure what she meant by dealing with the caseload. Well, she, there's a notification that she wasn't personally involved, but I get your point. And I'm not saying, as the Court has indicated, I'm not saying that there's any forecall challenge here. It's just whether a parenthesis would have been used. On the issue of the- But what about the fact that trial counsel never submitted an affidavit saying, you know, if I'd had the opportunity, I would have exercised the peremptory, I was deprived of that opportunity. What about that lack of evidence? I agree. It's not there, and that's why I'm on plain error review. Well, no, but, yeah, plain error review still, there has to be some prejudice shown, and that would have been a way to show the prejudice after the fact. I suppose that, you know, maybe there could be a 2255 ineffective assistance of counsel claim where the lawyer were to submit an affidavit along those lines, but I agree. There is no affidavit there. I think that what the court can do, though, is look at the record and look at that particular juror and say, is that the type of juror a defense attorney would use a peremptory on? It may not be on a scale of 1 to 10. It may not be a 10, a definite peremptory, but I think it's in the range of 7 to 8. You know, I think that that's a JD degree. That's going to be the type of juror that the other jurors are going to look to. With the involvement with the district attorney's office, when you're interning, that's what you're volunteering to do. That's what you really want to do. Not necessarily. You may be just exploring. Sometimes that's the only internship you can get, but most people try it in law school to do something that they're interested in. Go ahead. I was just going to observe that I have several judicial friends who are both federal and state court judges who have been selected for jury, and they always serve, of course, if they're selected. Most of the time their peremptory is executed against them, but when they do serve, they have attempted to sit back and say, no, I'm not going to accept the formanship of this jury at all. I'm just one of you. So it kind of seems to me that just by having a JD or having been involved in the legal practice doesn't exclude anybody. Common sense, when you have 12 people sitting around a table, there's a great leveler in there, and everybody puts their pants on one leg at a time. So I don't quite buy this business of simply having any kind of legal background or experience is going to cause a problem within the jury room. I agree. I'm not saying it would cause a problem. Certainly lawyers, judges can sit and be excellent jurors and maybe aren't the four persons. I'm just saying that as a defense attorney and trying to figure out whether I'm going to exercise a peremptory, when I see a lawyer that's interned in a district attorney's office, or at least a JD candidate, that's the type of jury that I would use. That argument would have more credibility with me if he had jumped up and down and said, hey, wait a minute. You know, I just got cheated out of two peremptory challenges, and this juror I feel really strongly about, and I'm really not happy with that person being on the jury and me having two peremptory challenges still on the table. If something like that happened, maybe that argument would have more credibility, but we just don't have that. Agreed. And that's why it's plain error, and I'm not contesting it. Okay. Thank you. Okay. Thank you. Very nice arguments on both sides. Tricky case. Thank you very much. United States v. GEPI is now submitted for decision.
judges: Mills, Fletcher, Rawlinson